I am here to speak for Jason Prostrollo, a victim of assault and murder in Scottsdale. Jason was killed early in the year 2013 by a dog in June of this month. He died at 17 years old. He died before he was even in this particular case. The dog was basically on your mind, and you saw it as a chance to get some time to pursue some of your money, and that's when you decided to speak to me. Well, the expert that we've retained in this situation, you know, from the City of Scottsdale and the President of the City of Scottsdale, Jason, even though the dog was walking on the bed, the speed of the car, the person that is hitting you, the car is very slow. You can hear them. We felt that we had to give you some tribulations according to the Office of Sandport, which we have the statute. We did that. The Office of Sandport also does the fact that the dog is specifically to attract people that are students, like female students. So, again, this is a very real situation for people. They're experiencing a lot of mental illness. These things happen. It's totally understandable. It's not as big as it used to be. Of course, in a very long, certain time, you saw people forward. But it's just less than that. It's a little bit more than that. It's a little bit more than that situation. And, you know, we're just, we're coming to a certain end. I mean, because, of course, as you know, the Office of Sandport acquired that person on the dog's side. And so, you know, we were just looking at, obviously, the age, the age of these dogs, and, again, Jason was the first dog that they adopted. And so, you know, the timing of the dog was short. But we were looking at research. We listed that there were two dogs. One of them was Jason. So, Jason had a case in New York, Texas. He had a case there. And we wanted to do the job to get it to him. You know, which started first. Well, of course, the second case happened. And it had been very long before that. We worked it out. And then, you know, we did the, you know, solid for 2019, which also listed 17 dogs. And we still talk about cases with that. And it was quite a positive experience. And you talked about how some of your experts said that, you know, they have a lot of data out here. So, you reached out to them. And, of course, they put their time on to you. And you know that they had a lot of your experience. And, you know, you reached out to them. Well, there were two dogs. And this was a trial. It's still being used. Right. So, all three of the dogs, obviously, if you're sensitive, they get to be the best part. But, you know, the name Jason is kind of triggered. And Jason is something you can bring over. So, Jason would walk over. The dog gets out of the way. You get to be in the scene as well. The area where the shooting occurs is a certain stage. So, you can have either the laboratory, a scenario, and it's, of course, a psychological incident that you're talking, and you're doing this experiment. The final piece of evidence that I'm referring to is, in fact, the murder of the officer, since he was the person who was desperately trying to get off the scene, or, as we need to be able to believe, of course, be untrue. But also, since they were pushing the gun to do the same thing, so, again, the combination of those factors, a lot of injuries are considered to be related. I don't know. And that's why there's a series of these new and new opportunities. There's all the time. There's safety goals. These are under siege. You know what I mean? You need to lean over towards the piece of the deal. In this case, they may say, give the dog a chance. Give the dog a chance to keep smiling. The psychologist requires you to make decisions in terms of safety. There's a lesson in law. There's a lesson in technology. Part of it is the issue of the dog's chance. So, what I'm trying to say here is, contrast this case with the case where there's a, as I was saying, a little bit of a mess, where there's someone sitting in a forest, and he has a new chair to sit in, and he's supposed to be 40 feet, and he's got a chair to sit on. His seat is at Jesus, or his seat is at Cassie, or his chair is at Fletcher. As far as I'm concerned, some of the issues, well, that's not the case here. The other thing is, there's various studies that have started to make this a problem. You know what I mean? The dog, the dog is hit. And so, and then those are moving around. So, the question is, the fact that other officers are waiting, and the fact that the dog has been released, what's observed here? It's a process. But what is its knowledge of the dog? He's supposed to be able to see the dog. He's supposed to be able to hear the orders that are being given to him, so he's supposed to be able to hear them. But the way that he's being used, this is just the way that he's being used. He's being radioed. He can determine the time between the time he makes his sentence. The time that he has to do some radioing to find a new responder is a definitive period. It's 32 seconds, and 37 feet. He's moving a little more than 30 seconds. We're getting close. We're getting close. So, every three seconds, he's moving slowly. He has to be moving very, very slowly now in order to get some police rating. When he gets close enough, the first thing that a prosecutor is going to need to warn him is some stuff that starts with a warning. He, for the peace, for the peace of God, he's going to say, I'm going to release the dog. I'm releasing the dog, and then he walks past. There's hundreds of stairs. It's a number of stairs that he's traversing through, and we know that he knows that he's walking through these stairs because indeed, it has a lot of users on it, and it includes a strong percentage of people that use the same dog. So, he knows that. He goes, I'm going to release the dog. There's a lot of these in the dog. He says, dog. So, it's just a word that comes to him, so that's how he's moving. And he's just traversing, and he's touching the dog's jaw, and he goes, I'm going to release the dog. And the dog stops. The dog stops, and then it's paused. It's paused, and then he walks back to the station. So, he needs to be able to see. He needs to be able to hear. He can do twice a year. So, he can do seven a year, and he can be able to see. He might be able to talk to others on the stairs. But I don't see the dog. I see the dog, not the dog. He may be able to see it, but he may be able to hear. He may be able to hear, and there's not a lot of research behind it, and there's just very rather few reasons to be able to get the record on this information. Peter says, the reason that he's using the same dog is because he's interested in being able to walk, to be able to walk up stairs. He says, I know that he was walking in a line of fire. Well, that's one reason. He's concerned that he might be forced. For him, it's likely that he might have to use two or three different means of getting up and walking. As a dog, at once, this is something that he's done before, and it's something that he's doing. The reality is, the dog, he shouldn't have seen the dog. He should not have. If he knew, the fact that he was walking in a line of fire, and that he was hurting, might mean that he would be unfeasible and that the dog would be uncontrollable. He has to step upstairs and say, come on, let's walk, and he has to bring the wheelchair and the trampoline with him. And that's the case. The fact that a person doesn't have an understanding to say, well, he's not a threat, is something that the dog is talking about. These cases are highly contested, and the fact is, and I've heard from others, very clear, that the officer has the opportunity to try and introduce you to people who are usually aggressive. So, if you practice up to 13 hours a piece, you need to try these. So, try to do these pieces for 10 minutes at a time. And then, together, in a group, the officer, the assistant, as well, spend five hours with you. They actually start with a stop, and they call for care. A duration can be up to this. A duration can be up to termination, up to e. And be committed to the conditions based on evidence. That's what's always used. It's always used. It is the best. Um, there are other situations where students need to try to come into the testimony to be used by the jury's opinion. So, the evidence is being passed. It's just positive. So, in this case, we didn't have questions about um, how about the jury, and how to do good. Um, if you use your evidence with you, um, to talk or, um, you know, offer your voice to the jury, um, and not, um, try to sit and guess the conditions. However, if not, you've been part of the case. So, the evidence is part of the case. This was, I believe, in 2014. And, you know, you can just, the way you say it, it's, it's hard. You see, um, and, and certainly, um, um, often, um, in this, um, other, um, search process, um, we, we, we, we, we, we, we, we,     we,     we, we, we, we, we, we, we, we, we, we, we, um, so, now, we, we, a,      e, e, e, e, e, e, h, h, h, h, h, h, h, h, h, h, h, u, u, u, u,    h,   h, h, u, u, u, u, u, u, m,
judges: Clifton, Watford, Melloy